UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JASON BRAUN,

    Plaintiff,

   -v-       1:25-CV-584

THE CENTER FOR INTERNET
SECURITY, ERIN HAGGERTY,
MICHELLE PETERSON, KRISTINA
RANKIN, CAROLYN COMER, and
CURTIS DUKES,

    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:     OF COUNSEL:

GODDARD LAW PLLC   MEGAN GODDARD, ESQ.
Attorneys for Plaintiff   LINDSDAY M. GOLDBRUM, ESQ.
39 Broadway, Suite 1540
New York, NY 10006

BOND, SCHOENECK &   MICHAEL D. BILLOK, ESQ.
 KING PLLC
Attorneys for Defendants
268 Broadway, Suite 104
Saratoga Springs, NY 12866

DAVID N. HURD
United States District Judge

## DECISION and ORDER

### I. INTRODUCTION

This is a disability discrimination matter.  On December 20, 2024, Jason Braun ("Braun" or "plaintiff") filed a complaint in New York Supreme Court, Rensselaer County.  On May 8, 2025, defendant The Center for Internet Security ("CIS"), along with CIS employee defendants Erin Haggerty ("Haggerty"), Michelle Peterson ("Peterson"), Kristina Rankin ("Rankin"), Carolyn Comer ("Comer"), and Curtis Dukes ("Dukes") (collectively the "defendants") removed the action to federal court pursuant to 28 U.S.C. §§ 1331, 1441, and 1446.  Dkt. No. 1.

On June 16, 2025, plaintiff re-filed his five-count complaint, which brings claims for: (1) disability discrimination, hostile work environment, and failure to accommodate in violation of the Americans with Disabilities Act of 1990 ("ADA") against CIS; (2) retaliation in violation of the ADA against CIS; (3) disability discrimination, hostile work environment, and failure to accommodate in violation of the New York State Human Rights Law ("NYSHRL") against CIS and Haggerty; (4) retaliation in violation of the NYSHRL against CIS and Haggerty; and (5) aiding and abetting discrimination and retaliation in violation of the NYSHRL against Haggerty, Peterson, Rankin, Comer, and Dukes.  Dkt. No. 6.

On July 31, 2025, defendants filed a motion to dismiss pursuant to Federal Rules of Civil Procedure ("Rules") 12(b)(5) and 12(b)(6). Defs.' Mem, Dkt. No. 7-8. That motion has been fully briefed and will be considered on the basis of the submissions and without oral argument. Dkt. Nos. 6, 7-8, 12, 13.

## II. BACKGROUND

Braun is a resident of Johnsonville, New York. Compl. ¶ 9. In or around 2003, he was diagnosed with severe anxiety. *Id*. ¶ 20. Plaintiff also suffers from panic attacks, depression disorder, and chronic back pain. *Id*. ¶¶ 20–21, 44.

Defendant CIS is an independent, non-profit global cyber-security business that is registered in New York and located in Greenbush, New York. Compl. ¶ 12. At the time this lawsuit was filed, defendant Haggerty was a Team Leader of CIS's Cloud Security Team, where she served as plaintiff's supervisor. *Id*. ¶ 15. Defendant Peterson served as Haggerty's supervisor. *Id*. ¶ 16. Defendants Rankin and Comer were each Human Resources ("H.R.") representatives at CIS. *Id*. ¶¶ 17–18. Defendant Dukes was the Executive Vice President at CIS. *Id*. ¶ 19.

In approximately 2015, plaintiff was hired by CIS as a Help Desk Agent. Comp. ¶ 25. At that time, his anxiety disability was disclosed to management and coworkers whom he alleges were "receptive" and

"encouraged him to share his story." *Id*. ¶¶ 25–27. Braun was promoted multiple times and received yearly bonuses and awards from CIS during the period from 2015 to 2021 *Id*. ¶¶ 25–31, 53, 82.

According to plaintiff, CIS was so impressed with his performance that, "in or around 2018, they created a specific position for him: Associate Cloud Solutions Architect" on CIS's Cloud Security Team. Compl. ¶ 35. In his new role, plaintiff began reporting to non-defendant Kathleen Patentrager ("Patentrager"). Compl. ¶ 37.

In approximately 2019, plaintiff fell while snowboarding causing "persistent, severe back pain" and "exacerbated […] back problems that [he] had experienced for years." Compl. ¶ 45. As a result, plaintiff required weekly chiropractic treatment throughout 2019 and 2020. *Id*. ¶ 46. Plaintiff frequently used time off and informed colleagues, including Haggerty, when he needed to miss "work meetings or functions" to receive treatment. *Id*. ¶ 47. Plaintiff contends that Haggerty "was especially unsympathetic and downright rude about [his] disability[,]" that her attitude towards him changed when he sought reasonable accommodations to address his back injury, and that she made this disapproval known. *Id*. ¶¶ 48–50.

Chiropractic therapy did not improve plaintiff's back pain and he "was forced to undergo spinal fusion therapy" on August 10, 2020. *Id*. ¶¶ 52, 54. Two weeks later, Braun's physician advised him he would need a second back

surgery, which occurred on September 11, 2020.  *Id.* ¶¶ 55–56.  Following this "revision surgery[,]" plaintiff required bi-weekly appointments for the following year to receive back treatments.  *Id.* ¶ 57.  Despite using his lunch periods to attend these appointments, keeping his colleagues updated about his absences, and sharing with co-workers that he was experiencing significant pain, plaintiff alleges that Haggerty increasingly became unsympathetic and irritated due to his need for disability-based accommodation.  *Id.*  ¶¶ 58–59.  Around December of 2020, and at plaintiff's request, CIS provided a standing desk and exercise ball chair to help alleviate his back pain at work.  Compl.  ¶¶ 61–62.

At some point in early 2021, defendant Dukes, Patentrager, and Sharon Shoemaker ("Shoemaker"), a non-defendant manager at CIS, began a series of workplace conversations for employees to familiarize themselves with Dukes called "Coffee with Curt[.]"  Compl. ¶ 64.  Plaintiff alleges that Shoemaker and Dukes frequently requested his presences on these calls to discuss mental health, depression, and anxiety and referred to Braun as a "cheerleader" and "champion" for mental health awareness and transparency at CIS.  *Id.* ¶¶ 65–66.  Plaintiff "signed onto several calls throughout 2021 to discuss his mental health and struggles with anxiety and depression with countless colleagues and […] senior leadership.  *Id.* ¶ 67.

In May of 2021, Patentrager assigned the Cloud Security a mandatory presentation to be delivered to the entire company, and a portion of it was assigned to plaintiff. Compl. ¶ 68. Cognizant of his anxiety, plaintiff "carefully prepared" his portion, however, in a team meeting right before the presentation, Braun's portion was drastically changed which triggered his anxiety symptoms. *Id.* ¶ 69–70. Plaintiff then spoke to both Patentrager and Comer, informed them of his anxiety disability, and requested to be excused from the presentation as an accommodation and to avoid trigger a panic attack. *Id.* ¶ 71. Plaintiff's request was granted. *Id.* ¶ 72.

In the Summer of 2021, Patentrager retired and Shoemaker became the interim manager of the Cloud Security Team and Braun's direct supervisor. Compl. ¶ 74. In August of 2021, plaintiff discovered CIS was considering naming Haggerty as lead of the Cloud Security Team. *Id.* ¶ 75. Thereafter, plaintiff alleges telling Shoemaker that Haggerty held disdain towards him due to his disabilities and need for reasonable accommodation, that he feared being targeted if Haggerty became his manager, and that he hoped H.R. would protect him from Haggerty. *Id.* ¶¶ 76–78. But Braun contends Shoemaker was indifferent to his concerns. *Id.* ¶ 79. The next month, CIS announced Haggerty would become the Team Leader of Cloud Security reporting to Peterson. *Id.* ¶ 81.

- 6 -

After reporting his concerns about Haggerty to Shoemaker, plaintiff alleges he was retaliated against in the Fall of 2021 when, without explanation, Shoemaker and Dukes "suddenly stopped" requesting his attendance on the "Coffee with Curt" calls even though they continued to be held on a weekly basis.  Compl. ¶ 83.

In early January 2022, Haggerty effectively became Braun's supervisor, after which he contends his work environment immediately deteriorated. Compl. ¶ 84.  On January 14, 2022, plaintiff received an e-mail from Haggerty outlining expectations for the team and addressing certain ongoing performance issues, but it was only sent to Braun which immediately caused him anxiety.  *Id.* ¶¶ 85–87.

Plaintiff quickly reported Haggerty's e-mail to Peterson, who told him she was sorry but offered no additional explanation.  Compl. ¶ 88–89.  In plaintiff's view, Haggerty singled him out to signal "that she was not going to tolerate him discussing his anxiety [or] depression or grant any accommodations for him[,]" which caused him to suffer daily anxiety symptoms daily including vomiting and feeling "on the verge of an anxiety attack."  *Id.* ¶ 90–91.

On January 14, 2022, plaintiff met with Haggerty and Peterson to discuss why he was singled out and ask why a team meeting was never held to discuss changes in expectations with the team.  Compl. ¶ 95.  When Peterson

- 7 -

asked why plaintiff believed he was being singled out, he told her he was being "call[ed] out for things that [he] didn't know." *Id.* ¶ 96. After saying this, plaintiff contends that Peterson interrupted him, said the team needed a "reset[,]" and ended the meeting. *Id.*

Around this same time, Haggerty held a virtual meeting with the Cloud Security Team. Compl. ¶ 99. During this meeting, plaintiff alleges that when he attempted to participate, Haggerty "angrily cut him off and dismissed his responses" but did not treat anyone else in the meeting this way. *Id.* ¶ 100. Plaintiff alleges this affected his anxiety and he no longer participated in the meeting. *Id.* ¶ 101. Soon after, on January 20, 2022, one of plaintiff's co-workers, Ed Oechsner, allegedly reached out to him stating it was "obvious" that Haggerty treated Braun differently. *Id.* 102.

That same day, Oechsner called a meeting with the Cloud Security Team where, despite plaintiff's anxiety, he raised his issues about being singled out by Haggerty. Compl. ¶ 103. When plaintiff described how Haggerty's treatment of him exacerbated his anxiety, Haggerty allegedly stated that he cannot use his anxiety disability as an excuse any longer. *Id.* ¶¶ 104–105. After this meeting, plaintiff alleges that both "a peer and another leader" at CIS advised him to document his interactions with Haggerty moving forward and contact H.R., which plaintiff was hesitant to do out of fear of losing his job. *Id.* ¶ 109.

Haggerty also took issue with plaintiff's use of Slack, CIS's internal messaging system.  Compl. ¶ 110.  Specifically, she disliked plaintiff's failure to appear as "active" on Slack and admonished him in front of the entire Cloud Security Team for not doing so.  *Id*.  Plaintiff also alleges Haggerty expressed irritation when plaintiff engaged in team meetings, spoke to him condescendingly, gave "snarky responses" to his questions, and ignored his messages on Slack even though she appeared on the system as "active" but "elevate[d] other colleague's ideas."  *Id*. 112.

On February 10, 2022, the Cloud Security Team held a contentious morning meeting where Haggerty repeatedly dismissed Braun's requests for information about a work-related issue.  Compl. ¶¶ 115–117.  According to plaintiff, however, when another co-worker spoke up during the meeting, Haggerty was cheerful and responsive.  *Id*. ¶ 118.  That afternoon, Haggerty sent plaintiff a meeting invite for later in the day.  *Id*. ¶ 119.  When plaintiff asked what to prepare for that meeting, plaintiff "curtly" replied that they would be discussing the Team Expectations e-mail from January and that Peterson would attend.  *Id*.

During this meeting, Haggerty asked Braun how he believed the morning meeting went.  Compl. ¶ 120.  Braun replied that while Haggerty was receptive to other team members, she was hostile towards his input and questions.  *Id*.  Plaintiff told Haggerty she was ostracizing him and treating

him differently than non-disabled colleagues. *Id.* ¶ 121. According to plaintiff, Haggerty ignored his comments and inquired about his process for "ticket time logging." *Id.* ¶ 122. When plaintiff replied and provided certain documentation to explain his process, he claims Haggerty "snippily" stated that this process had changed while he was out of office. *Id.* ¶ 123.

On February 14, 2022, Braun received another ambiguous meeting invitation, this time from Peterson. Compl. ¶ 127. At this meeting, Peterson inquired about plaintiff's issues with Haggerty before saying the entire Cloud Security Team needed a "level set." *Id.* ¶ 128–29. Two days later, Peterson sent the entire team an e-mail laying out her expectations. *Id.* ¶ 131.

One week later, on February 23, 2022, plaintiff complained to H.R. about Haggerty's behavior. Compl. ¶ 132. Rankin confirmed receipt of Braun's complaint. *Id.* ¶ 133. That same day, Peterson held a meeting with the Cloud Security Team to discuss the expectations "set out in the Team Expectations Email that […] Haggerty had only sent to [p]laintiff in January." *Id.* ¶ 134. During this meeting, plaintiff remained quiet, feeling unsettled about how Haggerty would react to his complaints to Peterson and Rankin. *Id.* ¶ 135.

In late February 2022, CIS conducted interviews for openings on the Cloud Security Team. Compl. ¶ 136. For one interview that was conducted virtually, Haggerty invited plaintiff to be present. *Id.* ¶ 137. On the day of

the interview, plaintiff experienced significant back pain and, knowing he would need to be on his exercise ball chair during the interview to remain comfortable, requested permission from Haggerty to remain off-camera for the interview. *Id.* ¶ 138. In response, Haggerty "dismissed [Braun's] disability and related pain" and "angrily warn[ed]" him there would be consequences for staying off-camera. *Id.* ¶ 139.

On or about March 1, 2022, Rankin emailed Braun and asked about Peterson's February 23rd meeting with the team. Compl. ¶ 140. Plaintiff responded by detailing his displeasure with his experience at work over the prior few months. *Id.* 142. One week later, Rankin suggested that plaintiff consider certain Employment Assistance Programs that might be helpful. *Id.* ¶ 143. On March 11, 2022, plaintiff responded to Rankin that he was not sure an Employment Assistance Program would be useful given Haggerty was causing his issue and suggested CIS instead provide Haggerty with training to prevent bullying, targeting, or singling out employees. *Id.* 146–148.

On March 15, 2022, Rankin requested a meeting with Braun, during which plaintiff said he was not comfortable speaking with Haggerty and that he was being forced to use paid leave for medical treatment to avoid the anguish and anxiety Haggerty caused him. *Id.* ¶¶ 151–152. Rankin told

plaintiff that she would bring the matter to Comer's attention, but plaintiff never heard back from H.R.  *Id.* ¶ 153–54.

On March 30, 2022, plaintiff alleges H.R. sent out an e-mail "to high level employees" that Haggerty would no longer be working at CIS before retracting it several hours later.  Compl. ¶ 155.  In plaintiff's view, Haggerty gave CIS an ultimatum that she or Braun needed to go.  *Id.* ¶ 156.  On April 1, 2022, defendant Comer requested a meeting with Braun.  Compl. ¶ 157.  At this meeting, plaintiff was informed he was being terminated from CIS.  *Id.* ¶ 158.

On or about July 25, 2023, plaintiff filed a Charge of Discrimination with the New York Equal Employment Opportunity Commission (the "EEOC").  Compl. ¶ 7.  On September 6, 2024, plaintiff was issued a Notice of Right to Sue letter from the EEOC.  *Id.* ¶ 8.

## III.   **LEGAL STANDARD**

### A. **Rule 12(b)(5)**

Rule 12(b)(5) authorizes a defendant to move for pre-answer dismissal of a pleading for insufficient service of process.  FED. R. CIV. P. 12(b)(5).  "[W]hen a defendant moves to dismiss under Rule 12(b)(5), the plaintiff bears the burden of proving adequate service."  *Dickerson v. Napolitano*, 604 F.3d 732, 752 (2d Cir. 2010) (quoting *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 298 (2d Cir. 2005)).  "In deciding a Rule 12(b)(5) motion, a court looks to materials

outside of the pleadings to determine whether service of process has been sufficient." *Jordan v. Asset Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 594 (E.D.N.Y. 2013) (cleaned up). If service is found to be insufficient, the court may grant plaintiff leave to cure the insufficiency or dismiss the action. *See, e.g.*, *DiFillippo v. Special Metals Corp.*, 299 F.R.D. 348, 353 (N.D.N.Y. 2014).

### B. <u>Rule 12(b)(6)</u>

To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must be enough to elevate the plaintiff's right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). So while legal conclusions can provide a framework for the complaint, they must be supported with meaningful allegations of fact. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

To assess this plausibility requirement, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In doing so, the court generally confines itself to the facts alleged in the pleading, any documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v.*

*Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

## IV.  **DISCUSSION**

Plaintiff's five-count action brings the following claims: (1) disability discrimination, hostile work environment, and failure to accommodate in violation of the ADA against CIS; (2) retaliation in violation of the ADA against CIS; (3) disability discrimination, hostile work environment, and failure to accommodate in violation of the NYSHRL against CIS and Haggerty; (4) retaliation in violation the NYSHRL against CIS and Haggerty; and (5) aiding and abetting discrimination and retaliation in violation of the NYSHRL against Haggerty, Peterson, Rankin, Comer, and Dukes.  Compl. ¶¶ 159–210.

Defendants have moved to dismiss, arguing Braun fails to state plausible claims for disability discrimination, hostile work environment, failure to accommodate, retaliation, or aiding and abetting discrimination and retaliation under either the ADA or NYSHRL.  Defs.' Mem., Dkt. No. 7-8 at 5–14.[1]  In addition, defendants contend that plaintiff failed to properly effectuate service upon CIS, Rankin, Haggerty, Comer, and Dukes.  *Id*. at 14–15.

---

[1]  Pagination corresponds to CM/ECF headers.

Plaintiff has opposed, arguing that he has made out plausible claims for disability discrimination, hostile work environment, failure to accommodate, retaliation, and aiding and abetting discrimination. Pl's. Opp'n, Dkt. No. 12 at 13–19. Plaintiff also contends that service was proper and that, in the event the Court does find it to be insufficient, he should be permitted to cure any defects. *Id*. at 12–13.

### A. Service Issues

The Court first turns to defendants' Rule 12(b)(5) motion. Defendants contend that plaintiff failed to effectuate service where they incorrectly served defendants Haggerty, Rankin, Comer, and Dukes, each of whom work remotely for CIS. Defs.' Mem. at 19. In addition, defendants assert that while CIS did receive a copy of the Summons with Notice, service was still improper because an individual not authorized to accept service did so on CIS's behalf. *Id*. Plaintiff opposes this motion, arguing that service of process was proper as to all defendants.

Turning first to Braun's service of process upon Haggerty, Rankin, Comer, and Dukes, Braun argues in opposition each was properly served when the process server both personally served and mailed copies of the Summons with Notice to defendants' actual place of business, *i.e.*, CIS's office in East Greenbush, New York.

Rule 4 sets out the requirements for service of process.  FED. R. CIV. P. 4. Under Rule 4(e), Service on an individual defendant must be accomplished by (1) following state law in the state where the district court is located, (2) personally delivering a copy of the summons and complaint to the defendant, (3) leaving a copy of the summons and complaint at the defendant's residence with another resident, or (4) delivering a copy to an agent authorized by appointment or law to receive service of process.  *Black v. Vitello*, 841 Fed App'x 334, 335 (2d Cir. 2021) (summary order).

It is clear from the parties' briefing that plaintiff did not attempt to serve Haggerty, Rankin, Comer, or Dukes personally or at their residences. Instead, Braun made service by delivering and mailing the Summons with Notice to CIS's place of business in East Greenbush, New York. But under Rule 4(e)(1), plaintiff may also serve defendants by following New York law. Under New York Civil Practice Laws and Rules ("CPLR") 308(2), a natural person may served by:

> delivering the summons within the state to a person of suitable age and discretion at the actual place of business ... of the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business in  an  envelope  bearing  the  legend "personal and confidential" ... within twenty days of [the delivery].

N.Y. C.P.L.R. § 308(2).  New York court construe a person's actual place of business has been construed as: (1) a place where the defendant regularly

transacts business, or (2) an establishment that the defendant owns or operates, where there is a clear identification of the work performed by her within that place of business." *Warshun*, 957 F. Supp. 2d at 266 (quoting *Velez v. Vassallo,* 203 F.Supp.2d 312, 325 (S.D.N.Y.2002) (cleaned up).

In this context, a defendant can have more than one "actual place of business." *Warshun*, 957 F.Supp.3d at 266; *see also* N.Y. C.P.L.R. 308(6) (defining "actual place of business" as "any location that the defendant, through regular solicitation or advertisement, has held out as its place of business"); *Gibson, Dunn Crutcher LLP v. Global Nuclear Servs. Supply, Ltd.,* 721 N.Y.S.2d 315, 317 (1st Dep't 2001) (finding a defendant's actual place of business to be an address for purpose of service because ;defendant held it out as his business address and induced plaintiff's reliance by, among other things, receiving business mail at said address even though "defendant may have conducted business elsewhere at times"); *Columbus Realty Inv. Corp. v. Weng–Heng Tsiang,* 641 N.Y.S.2d 265, 266 (1st Dep't 1996) ("[I]n as much as appellant was an officer and co-owner of the business where CPLR 308(2) service was made, ... it is not significant that she worked mainly from her house rather than the place of business.").

Plaintiff alleges his process server served Haggerty, Rankin, Comer, Dukes, and Peterson by delivering the Summons with Notice and mailing copies to the CIS's East Greenbush office, which he contends is their "actual

place of business[.]" Pl.'s Opp'n, Dkt. No. 12 at 19. But plaintiff has not met his burden of showing that this office was the "actual place of business" for Haggerty, Rankin, Comer, and Dukes. Notably, defendants argue that Haggerty, Rankin, Comer, and Dukes do not maintain offices, desks, or any regular presence at this office nor do they report to or conduct business there in a meaningful or consistent way. Defs.' Reply, Dkt. No. 13 at 12. Plaintiff has not alleged that these defendants have held themselves out as working at the East Greenbush office.

Next, defendants contend that CIS was not properly served because they never designated the building's security guard as an authorized agent permitted to accept service on their behalf. Defs.' Mem., Dkt. No. 7-8 at 14. In opposition, Braun contends that he properly served the company where the Summons with Notice was delivered to an on-site security guard at CIS's East Greenbush, New York office who "confirmed his authority to accept service." Pl.'s Opp'n, Dkt. No. 12 at 19. In reply, CIS argues that plaintiff's contention that the CIS security guard was authorized to accept service lacks any evidentiary support. Defs.' Reply, Dkt. No. 13 at 10. Defendants argue plaintiff's process service incorrectly identified an on-site security guard as a manager, when he was neither a manager nor authorized agent. *Id.*

Rule 4(h) governs service upon corporations and allows for service of process to be made by way of the same methods laid out *supra* in Rule 4(e)

- 18 -

while also allowing service by delivering a copy of the summons and complaint to an officer, manager, or other authorized agent. *Black v. Vitello*, 841 F.App'x 334, 335 (2d Cir. 2021) (citing FED. R. CIV. P. (4)(h)(1)). In New York, CPLR § 311 also "permits personal service on a corporation to be made by delivering the summons 'to an officer, director, managing or general agent, or cashier or assistant cashier or *to any other agent authorized by appointment* or by law to receive service.'" *Nationwide Mut. Ins. Co. v. Kaufman*, 896 F. Supp. 104, 108 (E.D.N.Y. 1995) (quoting N.Y. C.P.L.R. § 311)).

   "The law does not require that the process server make a factually accurate determination of the status of the person who is served, but rather that service be 'made in a manner which, viewed objectively, was calculated to give the corporate defendants fair notice of the legal proceedings against them.'" *Id*. (quoting *Carlin v. Crum & Forster Insurance Company,* 565 N.Y.S.2d 519, 520 (1st Dept. 1991). "Where a process server is led to believe, by employees of the defendant corporation, that he is serving papers on a managing agent of that corporation or other person authorized to accept service, service will be deemed valid if that belief is reasonable." *Id*. (citing *Gammon v. Advanced Fertility Servs., P.C.,* 592 N.Y.S.2d 23, 23 (1st Dept.1993).

Upon review, plaintiff has not met his burden of showing that defendants CIS, Haggerty, Rankin, Dukes, or Comer were ever properly served.

"Rule 4(m) governs both (1) the dismissal of actions for untimely service of process and (2) extensions of the time in which service may be effected." *Zapata v. N.Y.C.*, 502 F.3d 192, 195 (2d Cir. 2007).  Under this rule, where service of the summons and complaint is not made upon a defendant within 120 days of the filing of the complaint, the Court shall either dismiss the action without prejudice or direct that service be effected within a specified time provided plaintiff shows good cause for the failure.  *Id*; *see* FED. R. CIV. P. 4(m).  In addition, a district court *may* grant an extension in the absence of good cause, but it is not required to do so.  *Id*. at 197.

While plaintiff has not provided any explanation for the failure to properly serve CIS, Haggerty, Rankin, Comer, or Dukes, the Court will, in its discretion, permit plaintiff one final chance to properly serve all defendants in this matter as set forth under the Federal Rules of Civil Procedure and General Order # 25.  *See* Dkt. No. 2.  Accordingly, Braun will be given until April 27, 2026 to serve all defendants in this matter and file an affidavit of service on the docket.  In the event that plaintiff fails to comply and properly serve each defendant, this matter will be dismissed with further Order.

### B.  <u>Remaining ADA and NYSHRL Claims</u>

In light of plaintiff's failure to effectuate service as to CIS, Haggerty, Rankin, Dukes, or Comer, the Court declines to address the 12(b)(6) component of defendants' motion at this time.  In the event that plaintiff timely files an affidavit of service as directed *infra*, defendants will be permitted to re-file their motion.

## V.  <u>CONCLUSION</u>

Plaintiff has failed to properly serve defendants CIS, Haggerty, Rankin, Dukes, or Comer.  However, the Court, in its discretion, will permit plaintiff one final opportunity to make service on all defendants.  The Court declines to address the remainder of defendants' arguments at this time.

Therefore, it is

ORDERED that

1.  Defendant's motion to dismiss (Dkt. No. 7) is DENIED;

2.  Plaintiff' has until April 27, 2026 to serve the Summons and Complaint to all defendants and file an Affidavit of Service;

3.  In the event that plaintiff timely files an Affidavit of Service as to all defendants, the Clerk is directed to set answer deadlines to plaintiff's complaint as to each defendant; and

4.  In the event that plaintiff fails to timely file an Affidavit of Service as to any defendant, the Clerk is directed to dismiss plaintiff's complaint without further Order of the Court.

The Clerk of the Court is further directed to terminate the pending motion and set deadlines accordingly.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  March 24, 2026
        Utica, New York.